UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CAPITAL MOTOR LINES, | ) <br> ) <br> ) |
| Plaintiff, | ) <br> ) |
| v. | ) Civil Action No. 1:08-0964 (ESH) <br> ) |
| DETROIT DIESEL CORP., | ) <br> ) |
| Defendant. | ) <br> ) |

# MEMORANDUM OPINION

Plaintiff Capital Motor Lines ("Capital Motor") brings this action against Detroit Diesel Corporation ("Detroit Diesel") after a June 8, 2005 fire in the engine compartment of a motor coach owned by Capital Motor. Capital Motor alleges breach of implied warranty and two counts of negligence, and seeks damages from Detroit Diesel, the manufacturer of the motor coach engine, for property damage to the motor coach and its loss of use as a result of this fire.

Before the Court is Detroit Diesel's motion for summary judgment. For the reasons set forth herein, this motion will be granted.

## BACKGROUND

Capital Motor is an Alabama corporation with its principal place of business in Montgomery, Alabama. (Compl. ¶ 3.) Detroit Diesel is incorporated in Delaware with its principal place of business in Detroit, Michigan. (*Id.* ¶ 4.)

On September 24, 2001, Capital Motor purchased a 2002 model year motor coach for $340,000.00.[1] (*Id.* ¶ 6.) Greyhound Lines, Inc. took delivery of this coach and operated it pursuant to an agreement with Capital Motor. (Def.'s Statement of Undisputed Facts ["Def.'s Facts"] ¶ 7.) The motor coach was equipped with a Detroit Diesel Series 60 engine. (*Id.* ¶ 6.) On June 8, 2005, while Greyhound was operating the coach in Washington, D.C., the driver of the motor coach noticed smoke coming from the rear of the motor coach. (Compl. ¶ 10.) After stopping, the driver saw flames from the rear of the coach which later spread throughout the vehicle. (*Id.* ¶ 11.) No personal injuries or deaths resulted from the fire, but the motor coach was rendered a complete and total loss.[2] (*Id.* ¶ 12.) A subsequent inspection of the motor coach by Capital Motor in August 2005 determined the cause of the fire to be engine malfunction.[3] (*Id.* ¶ 13.) In March 2006, Detroit Diesel issued a report stating that Series 60 engines were prone to turbocharger compressor failures which could result in fires, and that it would conduct a safety recall campaign to remedy the problem. (*Id.* ¶ 14.)

On June 5, 2008, Capital Motor commenced this suit against Detroit Diesel and MCI. Capital Motor alleged three counts against Detroit Diesel: (1) breach of implied warranty; (2) negligence in designing, marketing, testing, selling and distributing the engine which caused the

---

[1] Capital Motor purchased the motor coach from Motor Coach Industries, Inc. and Motor Coach Industries International, Inc. (collectively "MCI"). The complaint originally included negligence and breach of warranty claims against MCI, but these were voluntarily dismissed by Capital Motor. (Notice of Voluntary Dismissal [Dkt. No. 15].)

[2] Capital Motor's insurance paid $268,013.33 in damages for the claim. (Def.'s Facts ¶ 13.)

[3] Detroit Diesel notes that it "denies many of the alleged facts and legal conclusions set forth in Plaintiff's complaint, including Plaintiff's allegation that the engine was defective and that Detroit Diesel is responsible for Plaintiff's damages." (Def.'s Mot. for Summ. J. ["Def.'s Mot."] at 3.) However, Detroit Diesel acknowledges that "those issues are not before the Court on this motion . . . [t]he only facts relevant to this summary judgment motion are set forth in the Statement of Undisputed Fact." (*Id.*)

fire; and (3) negligence in failing to warn Capital Motor of the defective engine. Capital Motor further alleged that it suffered significant property damage as a result of the engine fire, including total loss of the motor coach and related damages for loss of use. On June 13, 2011, Detroit Diesel filed the instant motion for summary judgment.

## ANALYSIS

Detroit Diesel contends that it is entitled to summary judgment because (1) the statute of limitations bars the breach of implied warranty claim and (2) the economic loss rule bars the negligence claims. Capital Motor argues that Detroit Diesel waived the statute of limitations as an affirmative defense in an interrogatory answer and that any attempt to re-assert this defense would result in substantial prejudice. Capital Motor further argues that it is not seeking damages to recover loss of the engine, but rather it is seeking damages to "other property" caused by the fire, specifically the motor coach, and as a result, its negligence claims are not barred by the economic loss rule. With respect to each of these issues, there are no disputed issues of fact (Pl.'s Opp'n to Summ. J. ["Pl.'s Opp'n"] at 2), and the parties agree as to the applicability of D.C. law. (Def.'s Mot. for Summ. J. ["Def.'s Mot."] at 4-6; Pl.'s Opp'n at 2 n.1.)

### I. BREACH OF IMPLIED WARRANTY: STATUTE OF LIMITATIONS

Capital Motor's claim for breach of implied warranty is governed by a four-year statute of limitations, pursuant to the Uniform Commercial Code § 2-275, which has been adopted in the District of Columbia. D.C. Code § 28:2-725; *see also Hull v. Eaton Corp.*, 825 F.2d 448, 456 (D.C. Cir. 1987); *Long v. Sears Roebuck & Co.*, 877 F. Supp. 8, 13-14 (D.D.C. 1995). The D.C. Code states that this statute of limitation begins to run upon tender of delivery:

> (1) An action for breach of any contract for sale must be commenced *within four years after the cause of action has accrued*. By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it.

3

> (2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A *breach of warranty occurs when tender of delivery is made*, *except that where a warranty explicitly extends to future performance of the goods* and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

D.C. Code § 28:2-725 (1)(2) (emphasis added). Here, Detroit Diesel contends that Capital Motor's breach of warranty claim accrued when it purchased the coach on September 24, 2001. (Def.'s Mot. at 7.) Because Capital Motor did not file suit until June 5, 2008, Detroit Diesel argues that the claim is barred by the four-year statute of limitations. (*Id.*) In response, Detroit Diesel does not dispute the applicability of a four-year statute of limitations, but argues that Capital Motor waived this affirmative defense by withdrawing it in an interrogatory response.[4] Detroit Diesel acknowledges the withdrawal, but contends it was submitted in error and any error was essentially harmless. The Court agrees.

It is Detroit Diesel's position that it "never intended to waive" the statute of limitations defense, but "simply made an error in an interrogatory answer" by inadvertently copying and pasting an earlier response. (Def.'s Reply in Support of Mot. for Summ. J. ["Def.'s Reply"] at 6.) In support of this, Detroit Diesel notes that it first served its answer to Capital Motor's complaint on August 21, 2008, which included the affirmative defense that plaintiff's claims might be barred by the applicable statute of limitations. (*Id.* at 7 (quoting Answer of Detroit Diesel [Dkt. No. 3] at 6).) On September 8, 2010, the parties jointly filed their Rule 16.3 Report,

---

[4] In answering the interrogatory to "identify all facts, documents and witnesses that support your contention that Plaintiff's claims may be barred by the applicable statutes of limitation and/or repose as alleged in your Seventh Defense," Detroit Diesel stated:

> [Detroit Diesel] has not identified any evidence in discovery on this issue, and, accordingly, withdraws this affirmative defense.

(Pl.'s Opp'n, Ex. A, ¶ 11.)

*see* LCvR 16.3, in which Detroit Diesel unequivocally asserted that "Plaintiff's implied warranty claim (Count IV) is barred by the statute of limitations." (*Id.* (quoting LCvR 16.3 Report at [Dkt. No. 14] at 2)).) The parties jointly requested nine months of discovery with a cut-off date of May 31, 2011. (*Id.*) For the following seven months, however, Capital Motor did not take any discovery from Detroit Diesel. (*Id.*) With just over a month remaining before the close of discovery, Capital Motor served interrogatories on Detroit Diesel on April 22, 2011, including the interrogatory in question. (*Id.*) Detroit Diesel's response to this interrogatory on May 26, 2011, withdrew the statute of limitations defense. (*See supra* note 4.) Upon learning of its mistake when Capital Motor filed its opposition to the summary judgment motion on July 5, 2011, Detroit Diesel submitted an amended response on July 7, 2011. (Def.'s Reply at 8.) Detroit Diesel therefore contends that this inadvertent error should not invalidate the defense, especially since it had previously and clearly asserted its intent to rely on this defense in its answer to the complaint (*id.* at 9), noting that a limitations defense "is sufficiently raised . . . by its bare assertion." *Daingerfield Island Protective Soc'y v. Babbitt*, 40 F.3d 442, 445 (D.C. Cir. 1994); *see also Barnes v. District of Columbia*, 270 F.R.D. 21, 23 (D.D.C. 2010).

In response, Capital Motor argues that Detroit Diesel plainly waived the statute of limitations defense in their interrogatory response and that reviving it now will prejudice Capital Motor because discovery has closed. (Pl.'s Opp'n at 5.) In particular, Capital Motor asserts that "waiver is the intentional relinquishment or abandonment of a known right," *U.S. v. Olano,* 507 U.S. 725, 733 (1993) (internal citations omitted), and, "if a party 'waives,' i.e., intentionally relinquishes or abandons an affirmative defense, no cure is available under [Federal Rules of Civil Procedure] Rule 15." *Harris v. Secretary, U.S, Dep't of Veterans Affairs*, 126 F.3d 339, 366 n.2 (D.C. Cir. 1997). Capital Motor misreads *Harris* for two reasons. First, *Harris*

involved a defendant who had totally failed to raise the affirmative defense in either its original or amended answer. Unlike *Harris*, however, Detroit Diesel raised the statute of limitations defense in its original answer, as well as a subsequent filing. (Def.'s Reply at 9.) Moreover, this Court recently held that a defendant may wait even "until the summary judgment stage or possibly the pretrial stage to assert all of its defenses." *Barnes*, 270 F.R.D. at 23. As such, if a defendant is allowed to assert an affirmative defense for the *first time* at the summary judgment stage, it seems only fair to allow defendant to amend an interrogatory response to correct a clerical error, thus conforming the interrogatory response to its prior pleadings. *See Barnes*, 270 F.R.D. at 23 ("[A] defendant can raise its affirmative defenses at a later stage in litigation . . . .")

Second, Capital Motor incorrectly invokes *Harris*'s discussion of Rule 15. Specifically, Capital Motor argues that Detroit Diesel is barred from seeking the curative provisions of Rule 15 because it "waived" its affirmative defense. (Pl.'s Opp'n at 5.) It further asserts that even if Detroit Diesel's waiver was subject to Rule 15 consideration, the waiver should be barred because it would "result in substantial prejudice" since Capital Motor was "deprived" of the "opportunity to explore factual inquiries that may refute the basis for the defense." (*Id.* at 5-6.) The Court is not persuaded.

To begin with, Detroit Diesel notes that it "is not seeking to amend its answer under Rule 15," but rather, it seeks to amend an interrogatory response, "pursuant to Rule 26(e)." (Def.'s Reply at 10.) Under Rule 26(e), a party "who has responded to an interrogatory . . . must supplement or correct its disclosure or response" in a timely manner if the party learns that "the

disclosure or response is incomplete or incorrect." Fed. R. Civ. P. 26(e). Detroit Diesel complied with this rule by filing its amended response once it recognized the error.[5] (*Id.*)

More importantly, Capital Motor fails to demonstrate it has suffered any prejudice as a result of Detroit Diesel's erroneous response since the response was submitted only four days before the close of discovery. It strains credulity for Capital Motor to now assert that these intervening four days "deprived" it of the opportunity to pursue discovery. Capital Motor sat on its rights to take discovery relevant to this defense for the eight months preceding the issuance of its interrogatories, despite having notice of this affirmative defense as early as August 21, 2008, when Detroit Diesel first filed its answer in response to the original complaint. Moreover, even if discovery had not been about to close, Capital Motor fails to point to any relevant discovery that it could have actually taken had there been no erroneous response. Capital Motor suggests that it would have wanted to "explore" the issue whether the "coach was equipped with the original engine at the time of the incident in June 2005." (Pl's Opp'n at 6.) Since Capital Motor owned the motor coach during the entire period prior to the accident, if a different engine had been installed, Capital Motor would necessarily have known about it. (*See also* LCvR 16.3 Report [Dkt. No. 6] ¶ 15 (Capital Motor admits that the motor coach was in fact "equipped with a Detroit Diesel engine" at the "time of manufacture").) Capital Motor also suggests that under D.C. Code § 28:2-725, discovery would have been useful in determining if the warranty had been extended to future performance. (Pl.'s Opp'n at 6.) Again, this makes no sense in an implied warranty case, since such a warranty as to future performance can only exist where there

---

[5] Even if Rule 15 were applicable, the Court in *Harris* noted that no cure was available under Rule 15 if "[the] party 'waives,' i.e. *intentionally* relinquishes or abandons an affirmative defense." *Harris*, 126 F.3d at 366 n.2 (emphasis added). Here, Detroit Diesel arguably did not intentionally abandon the defense since it had withdrawn the defense in error. *See Zuckerman Spaeder, LLP v. Auffenberg*, No. 10-7041, slip op. at 6(D.C. Cir. July 29, 2011).

7

is an express warranty, which is not the case here. *Lee v. Wolfson*, 265 F. Supp. 2d 14, 20 (D.D.C. 2003) (because "no express warranty existed," breach of warranty accrued from date of purchase); *Britt v. Schindler Elevator Co.*, 637 F. Supp. 734, 738 (D.D.C. 1986) (exception clause "applies *only* when a warranty explicitly extends to future performance"). Thus, because Capital Motor has not suffered any prejudice from the original interrogatory response, the Court concludes that Detroit Diesel's error did not constitute a waiver of the statute of limitations defense, and the breach of warranty claim is barred by the statute of limitations.[6]

## II. NEGLIGENCE: ECONOMIC LOSS RULE

The economic loss rule prevents a party suing in tort "from recovering on a strict products liability claim where the only damage is to the product itself."[7] *Liberty Mut. Ins. Co. v. Equipment Corp. of America*, 646 F. Supp. 2d 51, 56 (D.D.C. 2009) (citing *Potomac Plaza Terraces, Inc. v. QSC Products, Inc.*, 868 F. Supp. 346, 354 (D.D.C. 1994)). "[T]he failure of the product to function properly . . . is the essence of a warranty action, through which a

---

[6] Additionally, although the parties do not raise this issue, the decision as to whether attorney error may constitute excusable neglect is within the discretion of this Court. *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380 (1993). The Supreme Court addressed the meaning of "excusable neglect" in *Pioneer* by setting forth a four-factor test, subject to the discretion of the trial judge, providing:

(1) the danger of prejudice to the party opposing the modification,

(2) the length of delay and its potential impact on judicial proceedings,

(3) the reason for the delay, including whether it was within the reasonable control of the movant; and

(4) whether the movant acted in good faith.

*Pioneer Inv. Servs. Co.*, 507 U.S. at 395; *see also In re Vitamins Antitrust Class Actions*, 327 F.3d 1207 (D.C. Cir. 2003); *Yesudian v. Howard Univ.*, 270 F.3d 969 (D.C. Cir. 2001).

[7] The economic loss rule applies equally to strict liability and negligence claims. *See Potomac Plaza Terraces, Inc. v. QSC Products, Inc.*, 868 F. Supp. 346, 354 (D.D.C. 1994); (Def.'s Mot. at 9 n.6).

contracting party can seek to recoup the benefit of its bargain," and thus, the doctrine maintains the traditional distinction between contract and tort. *E. River Steamship Corp. v. Transam. Delval, Inc.*, 476 U.S. 858, 868 (1986). Under the economic loss doctrine, a plaintiff may not recover the "loss of value or use of the product itself, cost to repair or replace the product, or the lost profits resulting from the loss or use of the product." *Potomac Plaza*, 868 F. Supp. at 354 (internal citations omitted). However, a plaintiff may recover on "other property" damaged through a defective product even when barred from recovery on the product itself. *Saratoga v. J.M. Martinac & Co.*, 520 U.S. 875, 877 (1997).

Capital Motor alleges that it is only seeking to recover damages to "other property" caused by the fire and does not dispute that recovery for the engine, as opposed to the motor coach, is barred under the economic loss rule.[8] (Pl.'s Reply at 3.) Capital Motor relies exclusively on the decision in *Nat'l Coach Works of Va. v. Detroit Diesel Corp.*, 128 F. Supp. 2d 821 (D. Md. 2001). In that case, National Coach, purchaser of a motor coach, brought suit against Detroit Diesel, manufacturer of the engine, for damages arising out of an engine fire that destroyed the motor coach. *Nat'l Coach*, 128 F. Supp. 2d at 831. The district court denied defendant's motion for summary judgment, holding the defendant liable for damages arising from the loss of the motor coach, since the motor coach constituted "other property" and therefore was exempt from the economic loss doctrine. *Id*.

While *National Coach* is on all fours with this case, this Court is not bound by that decision nor does it find it to be persuasive. The holding in *National Coach* is based on *Saratoga*, a product liability suit brought by an owner of a fishing vessel. *Saratoga*, 520 U.S at

---

[8] Although the District of Columbia Court of Appeals has not formally adopted the economic loss rule, other judges in this Court have consistently applied the doctrine. *See Liberty Mut. Ins. Co.*, 646 F. Supp. 2d at 56; *RLI Ins. Co. v. Pohl, Inc. of Am.*, 468 F. Supp. 91, 94 (D.D.C. 2006); *Furash & Co., Inc. v. McClave*, 130 F. Supp. 2d 48, 56 (D.D.C. 2001).

9

877. In *Saratoga*, the Supreme Court found that a plaintiff could recover for damage to "*extra equipment* (a skiff, a fishing net, spare parts) *added* by the initial user after the first sale and then resold as part of the ship," although it could not recover for physical damage caused to the "product itself", which was defined as including "at least of a ship as built and outfitted by its original manufacturer and sold to an initial user." *Id.* Anticipating the risk of an overly expansive interpretation, the Supreme Court held that "[w]hen a manufacturer places an item in the stream of commerce by selling to an Initial User, that item is the 'product itself,'" *id.* at 879, and, thus, the economic loss rule applied where "a component part" of the vessel, "as placed in the stream of commerce by the manufacturer and its distributors," caused the harm. *Id.* at 883.

Consistent with the rule announced in *Saratoga*, several circuit courts have narrowly interpreted the "other property" exception to the economic loss doctrine. For example, the Third Circuit noted that "it is well-settled law that the buyer of a finished product cannot maintain a tort claim against the manufacturer if one of the finished product's components is defective and causes damage to the other parts . . . ." *Travelers Indem. Co. v. Dammann & Co.*, 594 F.3d 238, 252 (3d Cir. 2010). Similarly, the Sixth Circuit held that a nursing home operator was barred from recovering "other property" damages, resulting from a structural failure attributed to fire retardant chemicals, from the chemical manufacturer which produced chemical to treat lumber used in the building's trusses. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845 (6th Cir. 2002). Construing Kentucky law, the Sixth Circuit held "the product is the entire nursing home because [plaintiff] had the ability to allocate risk contractually and/or insure against loss with respect to the entire nursing home." *Id.* at 851; *see also Chevron USA, Inc. v. Aker Maritime, Inc.*, 604 F.3d 888, 901 (5th Cir. 2010) (damage to "floating spar," an oil

10

production facility, caused by defective *replacement* bolts was not economic loss, but property loss).

In contrast to these cases, *National Coach* held that, under Maryland law, an engine manufacturer was liable for "other property" damages to a motor coach resulting from the engine fire. Unlike *Saratoga*, however, the plaintiff in *National Coach* received the motor coach from the manufacturer with the component engine installed and did not add any additional equipment. National Coach purchased the motor coach fully assembled with the engine, and was thus an "initial user" under the standard established in *Saratoga*. Accordingly, the motor coach, complete with the Detroit Diesel engine, was received into the "stream of commerce" as a single product. Nevertheless, the *National Coach* court, applying Maryland tort law, held that because Detroit Diesel "manufactured and sold the engine" only, the "loss of the coach was 'other property' and may be recovered" by National Coach. *National Coach*, 128 F. Supp. 2d at 831. In doing so, it also relied upon an earlier Maryland case, cited by the Supreme Court in *Saratoga*, which allowed recovery for the value of livestock lost because of a faulty ventilation system in a poultry processing center. *Id.* (citing *A.J. Decoster Co. v. Westinghouse Elec. Corp.*, 634 A.2d 1330, 1333 (Md. 1994)). However, the recovery in *A.J. Decoster* was consistent with *Saratoga* because the livestock was not part of the ventilation system or the poultry processing center when it entered the stream of commerce but rather, the livestock was later added by the plaintiffs. *A.J. Decoster*, 634 A.2d at 1333.

In short, *National Coach* is inconsistent with the Supreme Court's ruling in *Saratoga*, the Maryland Court of Appeals' decision in *A.J. Decoster*, and several circuit opinions, for it failed to apply *Saratoga's* distinction between entering the stream of commerce as a single unit and adding other property after the product is sold.

Here, because the motor coach and engine were part of the same "product," the economic loss doctrine, as construed by the Supreme Court in *Saratoga*, precludes Capital Motor from recovering damages to the motor coach. To hold otherwise would mean that "nearly any component part would be a product and [this] would, as a result, effectively eviscerate the distinction between contract and tort law" for any machine more complex than an inclined plane. *Mt. Lebanon*, 276 F.3d at 850; *see also* Restatement (Third) of Torts § 21 cmt. E (1998). Therefore, the Court will grant summary judgment to Detroit Diesel on the negligence claims.

## CONCLUSION

For the foregoing reasons, the Court grants summary judgment in favor of Detroit Diesel. A separate Order accompanies this Memorandum Opinion.

/s/
ELLEN SEGAL HUVELLE
United States District Judge

Date: July 29, 2011